

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | |
| | ) | No.  35644-2-III |
| P.G. | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

SIDDOWAY, J. — After a 22-month dependency, the Grant County Superior Court

entered an order terminating the appellant father's parental rights to P.G.  The father

appeals the order, arguing that the record does not support the trial court's findings that

(1) the Department of Social and Health Services (Department) provided him with all

necessary services to correct his parental deficiencies, (2) there was little likelihood that

conditions would be remedied so that P.G. could be returned to him in the near future,

and (3) termination of his parental rights was in P.G.'s best interest.  Because substantial

evidence supports the findings, the order terminating the father's parental rights is

affirmed.

FACTS AND PROCEDURAL BACKGROUND

The appellant's daughter, P.G., was born on February 20, 2014.  In July 2015, the

Department began an investigation after receiving information from an Oregon agency

that 17-month-old P.G. and her mother had suffered domestic violence at the hands of

P.G.'s father. P.G.'s mother had fled with her to Oregon but later returned and renewed her relationship with the father.

On August 5, 2015, the Department held a family team decision making meeting with P.G. and her parents at which both parents agreed to engage in services to address the dysfunction they were experiencing. The parents quickly fell out of communication with the Department, however, and in the next several weeks it was determined through welfare checks and Department contacts that domestic violence and substance abuse was continuing. By September 1, 2015, both parents had told Department employees that they no longer wished to participate in services.

On September 2, 2015, the Department filed a dependency petition. An agreed order of dependency and disposition order was entered on November 3, 2015, and P.G. was removed from her parents' care at that time. Services ordered for the father in the disposition order were:

- A drug and alcohol evaluation, treatment, and urinalysis (UA),
- Parenting education and assessment,
- Domestic violence (DV) and anger management assessment and treatment,
- Parent bonding assessment, and
- Releases for treater information.

*See* Sealed Ex. P4 at 7. The preprinted disposition order included "psychological evaluation" as an additional service that could be ordered, but it was not marked as a service ordered for the father. *Id*.

In January 2016, the first dependency review hearing was held. The practice for handling dependency review and permanency plan hearings in Grant County was for the participants in a given case (the lawyers, the Department social worker, the guardian ad litem and the parents, if present) to have an unrecorded "round table" status discussion when the case was called. Report of Proceedings (RP) (Reference Hearing (RH))[1] at 28-29. A court order reflecting the status would then be signed by the round table participants. It would later be presented to the court for entry.

At the January 2016 review hearing, the finding was made that the Department had made reasonable efforts to provide services to the parents and the father had not complied with any of the services ordered. In addition to requiring compliance with prior services, mental health assessments and psychological evaluations were added as services ordered for both parents.

On May 5, 2016, the parents completed a parent-child assessment with Linda Wirtz, a licensed mental health counselor. For three hours, in a therapy room equipped with toys and games, Ms. Wirtz observed the parents interact with P.G. Ms. Wirtz characterized P.G. as "definitely present[ing] with an attachment disorder to both parents" and an "anxious insecure attachment" to her father. RP at 37. She attributed

---

[1] Two verbatim reports of proceeding are a part of our record. We refer to the report of the September 2017 termination trial simply as "RP" and refer to the report of a reference hearing taking place in November 2018 as "RP (RH)."

P.G.'s distrust of her parents to "their long history of substance abuse and domestic

violence and being emotionally unavailable to her." *Id.* She observed that P.G. appeared

to be more comfortable with her father than with her mother.

Ms. Wirtz concluded that P.G. was at risk in the parents' care and that it would

take a lot of work for the parents to meet her needs. She later explained at the

termination trial:

> Children with attachment disorders are really, really difficult to
> raise. Even [for] skilled parents who have [an] understanding of the
> children's needs and a lot of patience and a dedication to the child, it is
> extremely challenging because these children—the cycle of not trusting
> adults and having to be in charge to feel safe is something that's not
> overcome easily. It takes years for that child to actually believe that
> there's an adult that will meet their needs and take care of them.

RP at 44.

Based on the May 5 assessment, Ms. Wirtz recommended that the father receive a

complete substance abuse evaluation and treatment, domestic violence evaluation and

treatment, family therapy, and a mental health assessment. She also recommended

individual counseling for both parents "based on significant mental health concerns."

Sealed Ex. P10, at 6. She did not recommend a psychological evaluation.

On June 14, 2016, a permanency planning hearing was held. Neither of P.G.'s

parents attended. Once again, the father was found not to be in compliance with most of

the services ordered seven months earlier. He was found to be in partial compliance with

drug evaluation and treatment, and the parenting education and assessment. The court

continued to order the same services, including a mental health assessment and a psychological evaluation. The primary permanency plan identified for P.G. at the conclusion of the hearing was return to the home of the parents, with an alternative being adoption.

Following the June permanency planning hearing, social worker Bonnie Gaines was assigned responsibility for P.G.'s case. She re-referred the father to substance abuse, domestic violence, and parenting services. Two substance abuse evaluations were done, both resulting in recommendations that the father receive inpatient treatment. Ms. Gaines also referred the father for mental health treatment based on Ms. Wirtz's recommendation. He failed to engage in any substance abuse, domestic violence, or mental health services.

In November 2016, the Department petitioned for termination of both parents' rights.

In December 2016, a second permanency planning review hearing was held and the father was again found to have only partially complied with the parenting assessment and to be out of compliance with the other ordered services. The court kept in place its order for the services earlier identified. The primary permanency plan for P.G. was changed to adoption, with an alternative being her return to her mother.

At around this time—approximately 16 months after the family had come to the Department's attention and over a year after P.G. had been removed from her parents'

care—the parents started the family therapy that Ms. Wirtz had recommended in May 2016. It had been delayed in part because both parents were incarcerated for a time. The parents participated in two two-hour sessions. Ms. Wirtz observed the same behaviors as she had the prior May, although the father "was a lot more passive" and "was more of an observer" of the mother's interaction with P.G. RP at 46. Ms. Wirtz discharged both parents from family therapy in February 2017, after they failed to appear for two appointments and she was unable to contact them.

Neither of P.G.'s parents attended the final dependency review hearing that took place in May 2017. The father was again found to have only partially complied with the parenting assessment and was found out of compliance with every other ordered service. Ms. Gaines recognized at this time that a psychological evaluation should not have been identified as an ordered service for either parent, and it was stricken from the order. The order was signed by the round table participants and was entered by the court.

Termination trial

A one-day termination trial was held in September 2017, which neither parent attended. By the time of trial, three-and-a-half-year-old P.G. had been out of her parents' care for almost two years. Her father's last visit with her had been over nine months earlier, on January 6.

The State called Ms. Wirtz as its first witness. She testified that her role in performing a parenting assessment was to observe parenting skills and the relationship

6

between parents and children and to recommend services that would help the family become reunited. She testified to the recommendations she had made as a result of her assessment and the difficulty the parents faced in establishing a trusting relationship with P.G., given her attachment disorder. She testified to the two family therapy sessions she had with the parents and that her goals for the parents were not reached "because the parents stopped participating in services and no one heard from them." RP at 48. She testified that at the time she ceased providing services, she would not have recommended that P.G. be returned to their care because of the trauma P.G. had witnessed, her attachment disorder, the parents' lack of understanding of her needs and their failure to complete any services recommended to them. She expressed her opinion that P.G. "needs permanence right now." RP at 51.

The State then called Ms. Gaines. She testified that in 2016 she began helping Mike Rollins, the social worker assigned to P.G.'s case. She was formally assigned P.G.'s case in June 2016.

Upon being assigned the case, Ms. Gaines determined that the father had received referrals but was not in compliance with most of the recommended services, which she identified as random UAs, chemical dependency, a parent bonding assessment and domestic violence assessment and treatment. She identified the parents' "drug of choice" as methamphetamine. RP at 68. She testified that since the disposition order was entered in the dependency in November 2015, the service plan had never changed. She testified

that after being assigned the case, she re-referred the parents for the recommended services.

Ms. Gaines testified that throughout the case, the parents were very sporadic in doing visitation, which ceased in January 2017 when the parents "stopped showing." RP at 66. She testified she had warned the parents that visitation was an important part of working towards reunification. She testified that she had not heard from the father for nine months, since mid-January.

Ms. Gaines testified to her opinion that neither of P.G.'s parents had remedied their parental deficiencies "[b]ecause they have not participated in any services." RP at 70. She testified that P.G. was in pre-adoptive foster care in a safe and stable home, and that there was no impediment to adoption other than her parents' rights. She agreed with Ms. Wirtz that P.G.'s need for permanency is "right now." RP at 72.

In cross-examining Ms. Gaines, the father's lawyer asked her if she had recently received information that he was in inpatient treatment; Ms. Gaines answered that she had. She later explained that she had been notified a month earlier that the father was in the Grant County Jail and had gone to make contact with him, but was told he had been transferred to a drug treatment facility. The trial court sustained the father's lawyer's objection that this was hearsay. Ms. Gaines testified that she had been unable to determine whether the father was in treatment.

8

The guardian ad litem then addressed the court. She stated that "at the beginning of these cases, we do look for reunification and push for that. But, unfortunately, in this situation, we have not seen the parents complete the services and progress in their services to be able to provide a safe, well taken care of, maintained home for P.G." RP at 86-87. She told the court that P.G. "need[s] permanency in her life and the only way to reach that is the termination of parental rights." *Id.* at 87.

In closing argument, the father's lawyer argued that the Department was required to provide services that would be able to remedy parental deficiencies within a one-year time frame. From that premise, she argued:

> According to Ms. Wirtz . . . she did not believe even if my client had participated from the beginning that he was not likely to have been able to complete the services provided by her in that period of time and so I would ask that the Court find that the parenting program that was referred with Ms. Wirtz was not an adequate service that was provided to my client.

RP at 91-92. She never argued that a psychological evaluation was a court-ordered service for her client that the Department had failed to offer.

The trial court announced its decision at the conclusion of the evidence and argument, granting the State's petition. Formal findings and conclusions were presented by the State and entered thereafter. Contrary to Ms. Gaines's testimony at trial and the first and last of the court's disposition and dependency review orders, the trial court's finding of fact 2.12 stated in part that "[t]he services offered to the . . . father are

9

substance abuse, parenting education/assessment, domestic violence, *psychological evaluation* and mental health." CP at 86 (emphasis added).

The father timely appealed. The central issue raised by his opening brief was based on finding 2.12's implication that a psychological evaluation was ordered for the father, but was never offered. In its response brief, the Department conceded that finding 2.12 was incorrect because a psychological evaluation had been withdrawn as an ordered service in May 2017. Because the factual issue was disputed by the parties and the record was not sufficiently clear, this court concluded that additional or corrected findings were needed. We ordered the trial court to conduct a hearing and provide a supplemental order

> clarifying (1) whether a psychological evaluation was a court-ordered service for [the father] at the time of the termination trial; (2) if it was, whether the Department made a referral for the service; and (3) if it was a court-ordered service at the time of the trial but no referral was made, any facts that the court finds excuse the failure to make the referral.

Order for Fact Finding Proceeding, *In re Termination of P.G.*, No. 35644-2-III, at 3 (Wash. Ct. App. Nov. 2, 2018). We ordered the trial court to "permit the parties to address other factual matters it concludes are related to the matter to be determined, and to make a sufficient record." *Id.*

The trial court conducted a hearing on November 28, 2018. The father did not appear, but was represented by his trial lawyer. Ms. Gaines was the only witness called. No exhibits were offered by either side. In addition to hearing evidence whether a

10

psychological evaluation was court-ordered at the time of trial, the trial court allowed the State to offer evidence and argument on whether the father would have submitted to a psychological evaluation had one been offered, and on whether a psychological evaluation would have remedied the father's parental deficiencies.

The parties stipulated, and the trial court found, that no referral for a psychological evaluation was made. In a supplemental order filed with this court following the hearing, the trial court found that a psychological evaluation was not a court-ordered service for the father at the time of the September 2017 termination trial. It found that a psychological evaluation was ordered for the father on June 2016 and December 2016 in the dependency proceedings, but was removed from the May 2017 review order. The trial court additionally found that the father would not have availed himself of a psychological evaluation even it if was offered and provided, and that a psychological evaluation would not have corrected parental deficiencies.

After time was afforded for the parties to submit additional briefing, the appeal was considered by the panel without oral argument.

ANALYSIS

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Because parents have a

fundamental liberty interest in the custody and care of their children, the State may terminate parental rights "'only for the most powerful of reasons.'" *In re Welfare of S.J.*, 162 Wn. App. 873, 880, 256 P.3d 470 (2011) (quoting *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)).

Washington statutes respond to this constitutional command by providing a two-step process before a court may terminate parental rights. The father assigns error to findings made by the trial court at both steps.

## I.    SUBSTANTIAL EVIDENCE SUPPORTS THE TRIAL COURT'S CHALLENGED FINDINGS

In the first step of the process, the State must prove six statutory elements provided by RCW 13.34.180. These elements "focus[ ] on the adequacy of the parents and must be proved by clear, cogent, and convincing evidence." *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010) (footnote omitted).

The father challenges whether two of the six elements were proved in his case.[2] He first argues the State failed to prove that the court-ordered services and services necessary, reasonably available and capable of correcting his parental deficiencies within

---

[2] Of the four elements that he does not challenge, the first three are procedural and are seldom in dispute. RCW 13.34.180(1)(a)-(c). The sixth element, also unchallenged by the father, is "[t]hat continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(1)(f).

the foreseeable future, were expressly and understandably offered or provided. *See* RCW

13.34.180(d).

As previously explained, the father's opening brief assigned error to the trial

court's finding 2.12 that all court-ordered services were provided, arguing that a

psychological evaluation was a service listed in finding 2.12 and was not offered. We

now have clarified findings that there was no court-ordered psychological evaluation for

the father at the time of the September 2017 trial.

In his supplemental briefing, the father takes issue with what he claims are errors

in the trial court's supplemental findings. He argues that the trial court found,

erroneously, that the psychological evaluation was first ordered in June 2016, and that the

only reason it was ordered was due to a mistake on Ms. Gaines's part. This is wrong, he

argues, because the psychological evaluation as an ordered service appeared in a January

2016 review order that predated Ms. Gaines's involvement. We disagree with the

father's characterization of the trial court's findings.

It is important to bear in mind that during the reference hearing, none of the

dependency disposition, review, and permanency planning orders were offered or

employed in questioning Ms. Gaines. The January 2016 review order to which the father

now attaches importance was *not even mentioned* during the hearing. If it was

mistakenly implied that the first time a psychological evaluation appeared in an order was

13

in June 2016, it was because the father's lawyer suggested as much in cross-examining

Ms. Gaines:

> Q. So when you were assigned, were you the one who prepared the June 2016 [Comprehensive Family Evaluation (CFE)]?
> A. Yes.
> Q. And in that CFE, you noted that psych evals were being recommended for both parents; is that correct?
> A. It may have—yes. But—
> Q. *And under previously-ordered services, though, the psych eval was not included; is that correct?*
> A. Correct.
> Q. Okay. And so it looks like in that CFE you were requesting to add that as a service. And, in fact—oh, I'm sorry. I'll strike that.

RP (RH) at 22-23 (emphasis added). To the extent the highlighted question and Ms.

Gaines's answer suggest that no order before June 2016 identified a psychological

evaluation as an ordered service, that is wrong. As recounted above, psychological

evaluations had been identified as ordered services for both parents in the January 2016

review order. That review hearing predated Ms. Gaines's involvement.

A moment after the questioning set forth above, Ms. Gaines made clear that

without orders in front of her, she could not be sure what was added when:

> Q. And was that service added to the father at that June 2016 review hearing?
> A. Honestly, I can't recall. If it was, it should not have been. Because I noticed that it's in the May 2017 order.

RP (RH) at 23. Ms. Gaines was never shown or asked about the January 2016 review

order.

14

The father's supplemental briefing also argues that the trial court found that the only reason a psychological evaluation was included in *any* dependency review order was because of Ms. Gaines's mistake. What the trial court found was, instead, that the evaluation "was only added to the *June and December 2016 orders* at Ms. Gaines request because as a new social worker she thought it should be ordered in every dependency case." Reference Hr'g Suppl. Order at 2 (emphasis added). The trial court's findings do not address why the evaluation was included in the January 2016 order. Ms. Gaines was never asked if she could speak to that issue. No one else who could speak to it was called as a witness by either side.

The trial court's findings are supported by the evidence that was presented at the reference hearing. The father may not challenge them with speculation about information that was never identified as an issue during the hearing.

The gist of the father's argument in his supplemental briefing is that a psychological evaluation should never have been removed as an ordered service and was, in any event, a service necessary to correct his parental deficiencies. But substantial evidence supports the trial court's implicit finding that it was properly stricken as an ordered service in May 2017, and was properly not an ordered service at the time of the termination trial. The State demonstrated it was not identified as an ordered service in the original disposition order. Ms. Gaines testified that she did not understand it to be a necessary service. She testified that she noticed it in reviewing an original version of the

15

May 2017 review order, told the assistant attorney general, Dale Lehrman, that it should

not be there, and it was stricken.  In cross-examination, she elaborated:

> Q.  And then so once the service was ordered in June 2016, you testified
>     you didn't make a referral, and then you noticed in the May 2017
>     review hearing order that that box was checked and that is when you
>     spoke with your attorney about it; is that correct?
> A.  Yes.
> Q.  And did Mr. Lehrman adjust the court order at that time?
> A.  I believe he did.
> Q.  Do you know if Mr. Lehrman spoke with the other parties involved in
>     the case on that day when he made that change to the court order?
> A.  I believe he did.

RP (RH) at 25.  In addition to being signed off on by Mr. Lehrman and Ms. Gaines, the

May 2017 order was signed off on by the guardian ad litem and the lawyers for the

mother and the father.  No one was called at the reference hearing to dispute Ms.

Gaines's testimony that the psychological evaluation was stricken in the May 2017 order

because it never should have been included as an ordered service.

The father also argues that a psychological evaluation was a necessary service to

identify any co-occurring mental health and substance abuse problems.  But no such

evidence was presented at the termination trial.  The word "co-occurring" does not appear

in the verbatim report of the trial, the clerk's papers, or the trial exhibits.  It does not even

appear in the verbatim report of the reference hearing.  At the termination trial, lawyers

for the father and the mother had the opportunity to cross-examine Ms. Wirtz and Ms.

Gaines.  Neither of the parents' lawyers sought to demonstrate through those two

16

witnesses that a psychological evaluation was needed. Neither parent's lawyer called witnesses of their own to testify that a psychological evaluation was necessary. At most, the father's lawyer asked Ms. Gaines if she talked to the parents about doing a psychological evaluation in June 2016. Ms. Gaines responded that a psychological evaluation had been discussed, but was never court-ordered.

In the reference hearing, using her supervisor's notes to refresh her recollection, Ms. Gaines testified that when she and the father talked about the possibility of a psychological evaluation in June 2016, he told her he would not submit to one. She testified that her report that the father would not submit to such an evaluation was reflected in her supervisor's notes of a case review taking place on July 6, 2016.

In reviewing a trial court's decision to terminate parental rights, we will uphold its factual findings "if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). "Because of the highly fact-specific nature of termination proceedings, deference to the trial court is 'particularly important.'" *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 477, 379 P.3d 75 (2016) (quoting *In re Welfare of Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983)). We defer to the trial court's determinations of witness credibility and the persuasiveness of the evidence. *Id.*

17

The trial court credited Ms. Gaines's testimony and we defer to its determination

that she was credible. With the correction to finding 2.12, clear, cogent, and convincing

evidence supports the trial court's finding that the State expressly and understandably

offered or provided all ordered and necessary services.[3]

The second statutory element that the father contends the State failed to prove is

that there was little likelihood conditions would be remedied so that P.G. could be

returned to him in the near future. *See* RCW 13.34.180(1)(e). "A determination of what

constitutes the near future depends on the age of the child and the circumstances of the

placement." *In re Dependency of T.L.G.*, 126 Wn. App. 181, 204, 108 P.3d 156 (2005).

A rebuttable presumption that this element is present arises if a parent "fail[s] to

substantially improve parental deficiencies within twelve months following entry of the

dispositional order." *Id.* at 203-204 n.62. "A parent's unwillingness to avail herself of

remedial services within a reasonable period is highly relevant to a trial court's

determination as to whether the [Department] has satisfied RCW 13.34.180(1)(e)." *In re*

---

[3] The trial court's finding that the father had not and would not have availed himself of a psychological evaluation if offered and provided affords an alternative basis for satisfying the element. "Where the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services." *In re Welfare of M.R.H.*, 145 Wn. App. 10, 25, 188 P.3d 510 (2008) (citing *In re Welfare of Ferguson*, 32 Wn. App. 865, 869-70, 650 P.2d 1118 (1982), *rev'd on other grounds*, 98 Wn.2d 589, 656 P.2d 503 (1983)).

*Welfare of T.B.*, 150 Wn. App. 599, 608, 209 P.3d 497 (2009). The trial court found that

the rebuttable presumption applied. Clerk's Papers at 87 (Finding of Fact 2.13).

The father argues it was error for the court to apply the rebuttable presumption

because no psychological evaluation had been offered, and, as the statute provides, "The

presumption shall not arise unless the petitioner makes a showing that all necessary

services reasonably capable of correcting the parental deficiencies within the foreseeable

future have been clearly offered or provided." RCW 13.34.180(1)(e). We have found,

however, that the State proved all necessary services were clearly provided. The trial

court properly applied the rebuttable presumption and the father presented no evidence

overcoming it.

II.     SUBSTANTIAL EVIDENCE SUPPORTS THE TRIAL COURT'S FINDING THAT
        TERMINATION OF THE FATHER'S PARENTAL RIGHTS WAS IN P.G.'S BEST INTEREST

If a trial court concludes that the State has established the factors of RCW

13.34.180(1) by clear, cogent, and convincing evidence, it must then consider, as the

second step in the process, whether terminating parental rights is in the best interest of a

child. That termination is in the child's best interest must be established by a

preponderance of the evidence. RCW 13.34.190; *A.B.*, 168 Wn.2d at 911. Whether

termination of parental rights is in the best interest of the child is a fact-specific inquiry.

*In re Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). "Where a parent

has been unable to rehabilitate over a lengthy dependency period, a court is 'fully

19

justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period while [the parent] sought to rehabilitate himself.'"

*In re Dependency of T.R.*, 108 Wn. App. 149, 167, 29 P.3d 1275 (2001) (alterations in original) (quoting *In re A.W.*, 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

The father argues that terminating his parental rights effectively terminates P.G.'s familial relationship with his paternal grandparents, which is not in P.G.'s best interest. He points to documentation in the record that the paternal grandparents have expressed interest in serving as guardians for P.G. or seeking approval of an open adoption, and passed a home-study in that connection. He points to the fact that no safety concerns were identified about P.G. being in the paternal grandparents' care.

At the outset of the termination trial, the mother (and only the mother) brought a motion for a continuance, asking for time to address this possible alternative placement. It was represented during argument of the motion that the Department opposes P.G.'s placement with the paternal grandparents. It was also represented that motions to change P.G.'s placement to the paternal grandparents had twice been denied by a court commissioner, although the second time the motion was only partially denied, with provisions for further evaluation. The trial court denied the mother's continuance motion, concerned about prior continuances and the importance of permanence for P.G.

It also observed that P.G.'s eventual placement was "an issue that can be brought up independent of any kind of termination issue." RP at 27.

The father's lawyer did not further develop the record on the placement issue during the termination trial. She did not argue to the trial court that the placement issue was relevant to its "best interest" determination.

Trial counsel did not deem it worthwhile during the termination trial to develop a record on why the Department opposed placing P.G. with the paternal grandparents and why the court commissioner had twice refused to order a change of placement. We will not speculate about this inadequately-developed issue. *See* RAP 2.5(a).

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Korsmo, J.

21